FILED
2026 Sep-24 AM 11:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

**ANTHONY LAMON FRAZIER,**
Petitioner,

**v.**

**UNITED STATES OF AMERICA,**
Respondent.

**Case No. 1:23-cv-8010-CLM**
**(1:20-cr-300-CLM-GMB)**

# MEMORANDUM OPINION

Anthony Lamon Frazier moves to vacate, set aside, or otherwise correct his sentence under 28 U.S.C. § 2255. (Docs. 1, 8). The court dismissed many of Frazier's claims in its previous opinion and order but ordered an evidentiary hearing on Frazier's claims that his trial attorney, Emory Anthony, provided ineffective assistance by failing to obtain Frazier's work and cell phone records or protect Frazier's right to testify. (Doc. 14). The court has since held a two-day hearing. Having considered the evidence presented at the hearing, plus the evidence presented during Frazier's first and second trials, the court **DENIES** Frazier's remaining claims. The court explains why below.

## I.

## BACKGROUND

Starting in 2017, the ATF and Talladega County Drug Task Force jointly investigated what they believed was a drug-trafficking ring. Investigators came to believe that Frazier handled the group's finances. So ATF and local agents surveilled Frazier from 2018 through Frazier's arrest in September 2020. The investigation led to two trials involving Frazier: *Frazier 1* in December 2020 and *Frazier 2* in February 2024.[1] This court tried both.

This petition stems from *Frazier 1*, which ended with a jury finding that, during a controlled buy on October 10, 2019, Frazier possessed 50+ grams of methamphetamine with the intent to distribute it. *Frazier 2* involved the

[1] "*Frazier 1*" refers to *United States v. Frazier*, Case No. 1:20-cr-300. "*Frazier 2*" refers to *United States v. Frazier*, Case No. 1:21-cr-371.

broader drug-related conspiracy and ended with a different jury finding that Frazier laundered drug sales proceeds 23 times, laundered wire-fraud proceeds once, structured transactions at post offices to evade currency reporting requirements four times, conspired with Frederick Spencer to commit wire fraud, and filed false returns for tax years 2017, 2018, and 2019.

The key to understanding this opinion is to understand how Frazier's current "I couldn't have driven my work truck" defense for the *Frazier 1* trial would have opened the door to the surveillance evidence from *Frazier 2* and allowed the Government to expand the jury's view of Frazier from a possible one-time drug dealer to the financial mastermind of a local drug organization. So the court further explains the 2017-2020 investigation to show what the *Frazier 1* jury did not know about the scope of Frazier's criminal activities—and his use of his county work truck to carry out those activities.

**A. Surveilling Frazier and his work truck (*Frazier 2*)**

Frazier became a target of the ATF's investigation "toward the middle or end of 2018." *Frazier 2* (doc. 230, p. 174). At the time, Frazier worked as a tax assessor for Talladega County and drove a white truck assigned by the County, bearing the county seal. Multiple agents testified during *Frazier 2* that, during their investigation, they saw Frazier driving back and forth to Georgia in his county work truck. For example, ATF Special Agent Carrie Lane testified that Frazier would drive to Georgia in his county work truck "on a fairly" regular basis. *Id.*, p. 213. Officer Chris Rogers testified that Frazier "typically" traveled to Georgia in "his county work truck." *Id.*, p. 142. Local agent Shajuana Dennard testified that Frazier "would get in his county truck" and drive to Atlanta. *Id.*, p. 157. During these trips, Frazier was seen picking up items to bring back to Talladega.

Agents also saw Frazier make local trips in his county work truck, often ending with a trip to PNC Bank and post offices—the places they believed (and later proved in *Frazier 2*) that Frazier was traveling to launder money. Agent Lane testified that Frazier would go to Clevious Porter's body shop with nothing, come out with bags, then travel to PNC Bank and post offices. Agent Dennard and Officer Rogers similarly testified that Frazier would visit houses, then head to the bank and post offices.

Ultimately, the agents acted on two of these trips. The first was August 7, 2020. Agents surveilled Frazier driving the work truck to Douglasville, Georgia, to meet Bittrell Scott and pick up red Grubhub bags and a plastic bin containing liquor bottles and plastic baggies. *Id.*, pp. 142-46, 151-53, 238-239. That was a Friday. The next day, Saturday August 8th, Officer Rogers ran his trained drug dog Quincey on the vehicles parked in the lot where Frazier left his county work truck. Quincey gave a positive hit on Frazier's truck. Quincey also hit on Frazier's work truck during a second run on August 30th.

The second trip was September 9, 2020. Frazier again drove his county work truck to Georgia where he again picked up red bags and liquor bottles. *Id.*, p. 115. This time, however, officers stopped Frazier on his return trip and took the work truck. The drug dog indicated the presence of narcotics on the truck and the bottles, though no drugs were found. Officers also recovered postal money orders that later helped prove the *Frazier 2* laundering counts. Frazier was arrested that day.

**B. The Controlled Buy (*Frazier 1*)**

Now rewind a year. During their ongoing investigation, Agent Lane and Agent Matt Cross interviewed Terry Thomas, who told the agents that he knew that Frazier and Jeremy Rivers (aka "Block") were business partners in selling methamphetamine. So the agents had Thomas call Frazier to set up a controlled buy on October 10, 2019. Thomas recorded the buy, which started with Thomas giving Rivers $9,000 given to him by the officers. About 30 minutes later, Frazier drove his white county work truck in front of Thomas's vehicle, placed a bag of methamphetamine on the ground, and drove off. Thomas gave the meth to the awaiting officers. Testing showed that it was 93.3 grams pure.

**C. Charging and Trial Timelines**

As mentioned, the Government separately charged Frazier for the single October 2019 controlled buy (*Frazier 1*) and the broader money laundering, wire fraud, and structuring scheme (*Frazier 2*). This petition stems from the *Frazier 1* trial, but it's important to place the *Frazier 1* trial in temporal context with other events:

| Date | Event |
|---|---|
| N/A 2018 | Officers start surveilling Frazier |
| October 10, 2019 | Thomas buys meth from Frazier and Rivers |
| August 7-8, 2020 | Officers watch Frazier retrieve bags from Georgia<br>Drug dog alerts on county work truck |
| September 9, 2020 | Officers watch Frazier retrieve bags from Georgia<br>Frazier arrested |
| September 23, 2020 | Frazier indicted in *Frazier 1* |
| Nov-Dec, 2020 | *Frazier 1* trial |
| November 23, 2021 | Frazier, Frederick Spencer, Kelvin Dark, and Charlene Porter indicted in *Frazier 2* |
| April 6, 2023 | Frazier files § 2255 petition in *Frazier 1* |
| February 21-23, 2024 | *Frazier 2* trial |

Take note of two things: (1) *Frazier 1* was tried two months after indictment, while *Frazier 2* was still being investigated, and (2) *Frazier 1* was tried after officers watched and recorded Frazier driving his county work truck to Georgia, Birmingham, and local stops on non-county business.

### D. The *Frazier 1* trial

Emory Anthony represented Frazier at the *Frazier 1* trial. From voir dire on, Anthony challenged Thomas's identification of Frazier as the person he spoke to on the phone and the person who dropped the meth from a white truck. Thomas had not recorded Frazier or Rivers on camera, and as Anthony pointed out, Thomas testified that the drugs were delivered by a "city truck" rather than a "county truck." To further drive the point, Anthony introduced as his lone exhibit a picture of a white truck with no county seal.

The Government countered both narratives carefully, trying not to reveal to the jury the larger ongoing investigation that led to the *Frazier 2* charges. The court starts with the county work truck.

1. *The work truck*: The Government bolstered its evidence that Frazier used the county work truck to drop off Thomas's meth by introducing videos of the drug dog indicating the presence of a narcotic scent on Frazier's work truck in August 2020. Anthony objected when the Government asked Officer Rogers if the drug sniff was part "of a larger investigation going on in August of 2020." *Frazier 1*, (doc. 68, p. 68). The court held a sidebar, during which the Government told the court and Anthony that the larger investigation involved Frazier. *Id.*, p. 69. When Anthony said that mention of "another investigation" was "the problem," the court warned that mentioning an investigation beyond the October 2019 controlled buy would be "getting over the line." *Id.*, p. 68-70. So the court told the Government to re-ask the question without mentioning that investigation. *Id.*, p. 70. The Government complied.

The issue resurfaced when, during his closing statement, Anthony argued that the Government offered no evidence "that attacks his character by anybody." *Id.*, p. 106. Having withheld its evidence of Frazier's frequent trips to Atlanta, PNC bank, and multiple post offices, the Government objected. *Id.* The Government complained that Anthony just told the jury that no such evidence existed, even though the drug dog was deployed "because [Frazier] had taken trips to Atlanta, Georgia." *Id.* The Government complained that its "hands are tied" because it limited its trial presentation to keep out evidence of the larger investigation, and the parties argued back-and-forth (outside the jury's hearing) about the information contained in sealed warrants the Government showed Anthony before trial. *Id.*, pp. 106-08. Anthony ended by declaring he did not know that the investigation dealt with "other drugs," *id.*, p. 109, and the court instructed Anthony:

> THE COURT: Let's do this: From this point forward, Mr. Anthony, just stick to the facts that we have discussed in this trial.
>
> MR. ANTHONY: Yes, sir.
>
> THE COURT: And I will let you draw reasonable inferences from those facts, but they don't need to go to whether he had done anything else proper, improper, was a saint, there was no other investigations, because you don't want to open that door --

> MR. ANTHONY: Yes, sir.
>
> THE COURT: -- to where we have already tied the government's hands and to put it in.
>
> MR. ANTHONY: Yes, sir.
>
> THE COURT: And then if there's anything that you [Prosecutor Milner] think that you need to do before rebuttal, bring it up with the Court. Otherwise, I'll just expect that you know where the line is.
>
> MR. MILNER: Yes, Your Honor.
>
> MR. ANTHONY: I apologize.

*Id.* By holding this line, the court and the attorneys assured that the *Frazier 1* jury did not learn about the surveillance of Frazier that led to the drug sniffs.

2. *The cell phone call*: As for Anthony's challenge to Frazier's identity as the person Thomas called on the cell phone, when Anthony challenged Agent Lane's ability to identify Frazier's voice, she responded that she did recognize Frazier's voice because she previously heard it on "jail calls." *Id.*, pp. 9-10. Later, Agent Lane testified that she listened to "hundreds" of jail calls between Frazier and his "associate" Kelvin Dark, who was ultimately indicted in *Frazier 2*. That led to an objection and sidebar in which it was explained that Dark was in jail, so the court had the Government re-ask the question to tell the jury that Dark, not Frazier, was in jail. *Id.*, pp. 25-26. The jury thus never learned who Dark was or how he and Frazier connected to a drug organization.

—

In short, the court and parties ensured that the *Frazier 1* jury did not hear about the larger investigation into Frazier's role in a local drug ring. To the jury, *Frazier 1* was a case about a single sale of meth. The jury deliberated into a second day before ultimately determining that the Government had proved Frazier's guilt of the lone drug charge beyond a reasonable doubt. The court sentenced Frazier to 120 months' imprisonment. The Circuit Court affirmed the conviction and sentence.

**E. Frazier's § 2255 Motion**

The court explained Frazier's § 2255 motion, its background, and the standard of reviewing the motion in its previous opinion. (Doc. 14). The court will not duplicate those efforts here. The court concluded that opinion by setting three claims for a hearing:

1. Anthony was ineffective because he failed to obtain Frazier's work records;
2. Anthony was ineffective because he failed to obtain Frazier's cell phone records; and,
3. Anthony was ineffective because he failed to ensure that Frazier could exercise his right to testify at trial.

After setting these claims for a hearing, Frazier filed a trial brief that explained how these claims worked together: Frazier's time sheet would prove that Frazier took vacation days on October 10-11, 2019, and Frazier's cell phone records would prove that he took the vacation days to fly to Dallas to visit friends. (Doc. 17, ¶¶ 12-13). Frazier said that he would admit that he was in Talladega the morning of the 10th (he flew out later that evening), but the fact that he took the day off meant that "[h]e would not have driven his county work truck on October 10th if he had not gone to work." *Id.* ¶ 12.

At the hearing, Frazier testified that he did not realize that he had taken vacation days on October 10-11, 2019, until he reviewed his cell phone records in January 2021—more than a month after his conviction. Frazier thus admitted that he did not tell Anthony about the days off before trial, and he mentioned it to Anthony for the first time at sentencing. Frazier testified that he would not have driven the white county work truck on October 10, 2019, if he had taken the day off; it would have remained in the parking lot where the drug sniffs occurred in August 2020. But on cross-examination, Frazier admitted that he had driven the county work truck to Atlanta, Jeremy Rivers's house, and other locations on non-county business while being surveilled. Frazier reconciled this fact by saying that he was clocked in on those days, so he was in the truck. He did not, however, contest or rebut Anthony's testimony that Frazier told him that he could drive the work truck home at night.

—

Emory Anthony, Frazier's two brothers, and Frazier's girlfriend also testified at the hearing. The court recounts their relevant testimony within its discussion of the claims.

## II.

## DISCUSSION

In sum, the court finds that Frazier's "I couldn't have driven the county work truck" defense is incredible and that putting Frazier on the stand to present that theory during the *Frazier 1* trial would have significantly worsened Frazier's lot by opening the door to the Government's on-going investigation that led to the *Frazier 2* charges. The jury would have transitioned from deciding whether Frazier dropped a single bag of meth to wondering whether Frazier was the financial manager of an on-going drug ring.

### A. Deficient Performance

Because the prejudice analysis is the same for all three claims, the court starts by discussing why each of the three remaining claims fails the deficient performance element.

1. *Cell Phone Records*: Frazier's claim that Anthony should have secured his personal cell phone records fails for two reasons. First, Frazier cannot prove deficient performance or prejudice because he failed to introduce his cell phone records into evidence.

Second, Frazier failed to give Anthony a reason to look for Frazier's cell phone records before trial. Instead, Anthony testified that he investigated whether the phone number Thomas dialed for the controlled buy was Frazier's, and Anthony determined that it was not. Anthony then used that point against Agent Lane at trial, pointing out that no cell phone company or database tied the number Thomas called to Frazier. *See Frazier 1*, (doc. 68, pp. 9, 11, 22-23). The number instead belonged to a prepaid phone, and Anthony got Agent Lane to admit that she could not say Frazier bought the prepaid phone. *Id.*, p. 27.

For Anthony to go further and track down Frazier's personal cell phone records for possible use at trial only opened the possibility that those records contained evidence that Frazier had talked to Thomas, Jeremy Rivers, Kelvin Dark, or others connected to the sale of drugs in the Talladega area. With Frazier not giving Anthony a reason to think that securing his personal cell phone records would be fruitful, while having reason to think the records might be harmful, the court cannot say that it was objectively unreasonable for Anthony not to secure a copy of Frazier's cell phone records before trial.

2. *Work records*: Frazier also failed to prove that Anthony performed deficiently by failing to secure a copy of a time sheet that showed Frazier took vacation days on October 10-11, 2019. The court assumes without finding that the unauthenticated time sheet is accurate. Frazier admitted that he did not tell Anthony before trial that he was off work on October 10, 2019, and that he only thought to ask for the time sheet after noticing (a month after trial) that he made an early morning call to his workplace.

Anthony testified that his first and most important question for Frazier was about his alibi. Anthony testified that Frazier couldn't give him a person, place, or thing to help create an alibi. Anthony testified that Frazier never mentioned being on vacation, so he did not try to determine whether Frazier had taken the day off.[2] In fact, Frazier's habeas counsel conceded during his questioning of Anthony that Frazier had not told Anthony before trial that he was not working on October 10th.

The court cannot say that Anthony's failure to secure Frazier's time sheet fell below an objective standard of reasonableness when Frazier gave Anthony no reason to believe his work records would be beneficial. This is particularly true because Frazier told Anthony before trial that Frazier could drive the county work truck home at night (a point Frazier did not rebut), meaning that in Anthony's eyes, Frazier taking a day off did not mean that Frazier would be without the county work truck on the day of the controlled buy. If Frazier could use the truck regardless, Anthony had little reason to track down whether Frazier was 'on-the-clock' on October 10th.

---

[2] Anthony later testified that he called Frazier's place of work but could not get in touch with anyone. The court cannot say whether Anthony was trying to confirm Frazier's work attendance.

3. *Frazier's testimony*: Finally, the court finds that Frazier failed to prove that Anthony failed to protect his right to testify. To the contrary, the court finds that Anthony *did* discuss the issue with Frazier, and Frazier's testimony and argument to the contrary are incredible. The court recounts the last day of trial to explain why.

After the Government announced that it had one witness left, and with the jury in its room, the court had this discussion with Anthony:

> THE COURT: So what we need to do, then, obviously, you need to think about the defense, if any.
>
> MR. ANTHONY: I need to talk to my client and his family.
>
> THE COURT: And also, in addition to that, we need to take a look at the final instruction list and make sure that we get the appropriate case specific -- if y'all want to get together and do that at some point -- here, you can have this one.
>
> MR. ANTHONY: Is it a case?
>
> THE COURT: Yeah, I had handed y'all this earlier. There are certain instructions that it depends on how things go during trial. If y'all can agree on which ones, I can populate that over lunch.
>
> MR. MILNER: Yes, sir. And we are going to clear the room to allow Mr. Anthony to speak to his client.
>
> THE COURT: That's fine. All right. My staff and I will leave the room. The family can stay. I'm assuming y'all don't mind if the family stays.
>
> MR. MILNER: Not at all, Your Honor.
>
> THE COURT: All right. Mr. Frazier's family, y'all can stay in here. We are going to allow y'all to talk with Mr. Frazier and his attorney, and the rest of us will leave. Mr. Anthony, expect us to come back at about five till. So that gives you about 13 minutes. If you need more time –
>
> MR. ANTHONY: I will ask you.

> THE COURT: -- just let us know. Yeah, just let us know. I will be in chambers.
>
> MR. ANTHONY: Thank you, Judge.
>
> (Recess taken from 9:42 a.m. to 10:04 a.m.)
>
> (Jury in at 10:04 a.m.)

*Frazier 1* (doc. 68, pp. 49-50). After the Government's last witness, the court then called counsel and Frazier into chambers, at which point Anthony said that the defense had no witnesses and was going to rest. *Id.*, pp. 72-73; (doc. 69. p.4) (noting Frazier was in chambers). Anthony said the same thing in front of the jury, again with Frazier present. (Doc. 68, p. 74). Frazier did not protest the resting of his case without his testimony either time.

These facts beg the question: what happened during the 22-minute recess that the court gave Anthony to talk to Frazier and his family alone in the courtroom, which resulted in the decision to rest without Frazier testifying or Frazier complaining that Anthony forbid him from testifying?

At the hearing, Anthony testified that he talked to Frazier, although he didn't say if it was during the 22-minute break or some other break. Specifically, Anthony voiced his concern about Agent Lane's testimony earlier that morning that she heard Frazier talking to Kelvin Dark while Dark was in jail, plus his concern about Frazier's connection to Jeremy Rivers. Anthony told Frazier that his conversations with a "drug dealer" would be an issue if he chose to testify. But Anthony told Frazier that it was his choice and that he would put Frazier on the stand if Frazier wanted to testify. Anthony testified that he would never tell a client that he couldn't testify.

Frazier, on the other hand, testified that he and Anthony agreed before trial that Frazier would testify, but after trial started, they never discussed whether Frazier would testify. Frazier says that he first mentioned the issue after the jury reached its verdict, and Anthony told him that Anthony thought testifying was a bad idea because of Frazier's relationship with Rivers. Frazier also called his two brothers and his girlfriend. The brothers testified that they never met with Anthony and Frazier at the same time, and Frazier's girlfriend said that she never discussed whether Frazier would testify.

The court finds Anthony's version of events more credible. This court presided over trial and remembers clearing the courtroom to allow Anthony to talk with Frazier, and to allow Frazier's family to talk to Frazier and Anthony, about potential testimony. The court gave Anthony 13 minutes with more time if requested, and the record shows that he took 22 minutes. That break happened the same day that Agent Lane testified about the jail calls between Frazier and Dark—*i.e.*, the issue Anthony says he raised with Frazier when discussing his possible testimony. The court finds it incredible that no one talked about Frazier's testimony or the family members' testimony during that extended time when the court told everyone in the room that was the purpose of the break. The court instead finds as matters of fact that Anthony discussed the issue with Frazier; Anthony told Frazier his concerns about opening the door to questions about his relationship with Rivers and Dark; Anthony told Frazier the choice was his; and, Frazier decided not to testify.[3] Based on these facts, the court finds that Anthony was not deficient for failing to protect Frazier's right to testify. *See United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir. 1992) (en banc) (finding no deficient performance where the district court found factually that "[t]he Defendant was advised of his right to testify, was advised that he should not exercise that right, and did not protest").

—

In sum, the court finds that Anthony did not perform deficiently at trial. To the contrary, Anthony fought against evidence that suggested Frazier was connected to a broader drug organization, and he focused the jury's attention on the credibility of the Government's informant (Thomas) and case agent (Lane). The jury listened, as demonstrated by the jury's failure to reach a verdict the first day and by their question: "What factors do we, as the jury, need to look at to determine if the defendant is guilty or not through the evidence that is given to us and from the witness and ATF?" *Frazier 1,* (doc. 68, p. 127). That the jury ultimately convicted Frazier does not prove that Anthony's decisions were objectively unreasonable. And as explained below, Anthony's trial strategy was more reasonable and more likely to succeed than Frazier's new theory of defense.

[3] The court did not record a colloquy before allowing Frazier to rest, nor was one required. *See United States v. Van De Walker*, 141 F.3d 1451-52 (11th Cir. 1998).

### B. Prejudice

The court finds that Frazier was not prejudiced by Anthony's failure to offer Frazier's testimony and time sheets to argue that Frazier could not have driven his county work truck on the morning of October 10, 2019. For starters, Frazier taking the day off provides no alibi. Frazier said in his pretrial brief that he did not fly out "until the evening of October 10th," (doc. 17, ¶ 14), and Frazier testified at the hearing that he did not know where he was that day.

More importantly, Frazier testifying that he could not have driven his county work truck because he was not working would have made matters far worse. As detailed in the Background, three agents testified during the *Frazier 2* trial that they surveilled Frazier routinely driving his county work truck to Atlanta, Birmingham, and around the Talladega area conducting non-county business. This surveillance happened ***before*** the *Frazier 1* trial, and two of the three surveillance witnesses (Agents Lane and Officer Rogers) testified on the second day of the *Frazier 1* trial—meaning they were in the courthouse and available to testify about their surveillance of Frazier and the reason a drug dog sniffed Frazier's truck if Frazier opened the door during his testimony.

The court and both sides' counsel kept the jury unaware of the Government's larger investigation into Frazier's connection to the local drug trade. But if Frazier had taken the stand and testified that he could not have driven his work truck on October 10, 2019, the court would have found that Frazier opened the door to evidence of identity and opportunity under Rule 404(b)(2), particularly testimony that Frazier could drive his work truck when not conducting county business, thus opening the door to the broader investigation and Frazier's connections to known and suspected drug dealers—the very concern that pushed Anthony to advise Frazier against testifying.

For these reasons, the court finds no reasonable probability that the jury's verdict would have changed if Frazier had testified and introduced his time sheet into evidence to argue that he could not have driven his work truck on October 10, 2019.

## CONCLUSION

For these reasons, the court **DENIES WITH PREJUDICE** Frazier's claims that Emory Anthony was ineffective for not (1) obtaining Frazier's work records, (2) acquiring Frazier's cell phone records, or (3) ensuring that Frazier was allowed to exercise his right to testify in his own defense. Because the court's opinion about Frazier's claims spans two documents, the court will enter a separate final order that **DENIES** Frazier's motion outright, **DENIES** a certificate of appealability on all issues, and closes this case.

**Done** and **Ordered** on September 24, 2026.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE